IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PMA CAPITAL INSURANCE CO., et al., :
    Petitioners, :
: MISC.
v. : NO. 09-84
:
PLATINUM UNDERWRITERS :
BERMUDA, LTD., :
    Respondent. :

Diamond, J.                                                                        September 15, 2009

**MEMORANDUM**

      PMA Capital Insurance Co. asks me to vacate or modify an arbitration award in this reinsurance dispute with Platinum Underwriters Bermuda. I will vacate the award because it is not rational.

**I.     BACKGROUND**

    **A.     The Parties' 2003 Reinsurance Agreement**

      PMA is a Pennsylvania insurance company with its principal place of business in Philadelphia. (Doc. No. 19 at 1.) Platinum is a Bermuda reinsurance company with its principal place of business outside the United States. (Id. at 2; Doc. No. 9 at 2.) In 2003, PMA and Platinum entered into a reinsurance contract. PMA (the reinsured) paid a fee to Platinum (the reinsurer) to indemnify PMA for obligations PMA undertook through its issuance of insurance policies. (Doc. No. 19 at 3.) The Parties also agreed that in certain circumstances, Platinum was entitled to seek reimbursement for previously incurred losses that it could "carry forward." (Id. at 4.) To capture these obligations and entitlements, the Parties employed terms of art common

to the reinsurance industry. Although the meanings of those terms are not disputed, because the obligations are at the heart of this dispute, I will set out the agreed-upon meanings in some detail.

### The Experience Account

In reinsurance contracts, the reinsured commonly deposits funds into an interest-bearing account controlled by the reinsurer. As claims come due against the reinsured, they are paid first from this "experience account." If the claims exceed the account, the reinsurer is obligated to pay that excess amount. At the contract's conclusion, the reinsurer pays a "profit commission," returning to the reinsured the funds (if any) remaining in the experience account. (Doc. No. 21 at 4-5.)

### The Deficit Carry Forward Provision

Parties sometimes enter into separate reinsurance contracts that cover succeeding years. A "deficit carry forward provision" allows the reinsurer to carry forward any loss it may have incurred in one year to the next year, when the reinsurer can apply funds from that year's experience account (assuming it has a positive balance) to offset the first year loss. If, after any offset is applied and the contract has concluded, there is money remaining in the experience account, the reinsurer would normally be obligated to return that profit commission to the reinsured. (Id. at 4-5.)

The actual operation of a deficit carry forward provision is less opaque than the terminology might suggest. If, for example, during the pendency of a one year reinsurance contract, combined claims against the experience account exceeded the account's balance by $3 million, the reinsurer would pay $3 million to satisfy these claims. If the parties' reinsurance contract for the following year included a deficit carry forward provision, this $3 million deficit

would be carried forward and offset by funds still in the experience account at the conclusion of the second year contract. Any money then remaining in the account would be returned to the reinsured as a profit commission. (Id. at 5.)

### B. The Deficit Carry Forward Provision in the Parties' 2003 Agreement

PMA originally purchased reinsurance from St. Paul Re (a division of the St. Paul Insurance Company) for the coverage period 1999 through 2001. In 2002, St. Paul divested its reinsurance subsidiary, St. Paul Re, which became Platinum. In 2003, PMA and Platinum entered into the Reinsurance Agreement that is the subject of the instant dispute. (Id. at 6.)

Article 15 of the 2003 Agreement apparently provides that any deficit from PMA's 1999-2001 contract with St. Paul Re may be carried forward to the 2003 Agreement year and applied at the Agreement's conclusion to any positive balance remaining in the Experience Account. See Doc. No. 19 Mem., Ex.1 at 01-20; Doc. No. 19 at 4; Doc. No. 21 at 6. Article 19 of the 2003 Agreement conditions when Platinum may retain any deficit thus carried forward:

> Upon finalization of the payment of all Ultimate Loss Recoverable hereunder and/or Commutation, [Platinum] will relinquish to [PMA] 100% (one hundred percent) of the remaining Experience Account balance, if any, . . . less any projected paid loss deficit, if any, in respect of [PMA's 1999-2001 agreement with St. Paul Re].

(Doc. No. 19 Mem., Ex. 1 at 01-24.) "Finalization of Payment" of the "Ultimate Net Loss" refers to either: (1) the time at which Platinum has paid out the policy limits under the 2003 Agreement; or (2) December 31, 2021, whichever is earlier. (Doc. No. 19 Mem. at 3.) "Commutation" is the equivalent of a settlement, and terminates the Parties' rights and obligations under the contract. (Id.)

The 2003 Agreement thus provides that once Platinum has paid out its policy limits or the

3

Parties have agreed to Commutation (or December 31, 2021 – whichever is earlier), Platinum must return any money remaining in the Experience Account to PMA. Because Platinum apparently is entitled to carry forward any losses that St. Paul Re may have incurred under its 1999-2001 contract with PMA, however, Platinum may first retain any funds remaining in the 2003 Experience Account to offset these losses before returning the residual balance to PMA.

C.     **The Arbitration**

In 2008, a dispute arose between PMA and Platinum concerning the validity and scope of the Deficit Carry Forward Provision in the 2003 Agreement. PMA now concedes that this Provision "arguably would allow Platinum . . . to obtain a benefit under the 2003 [Agreement] if there were a deficit under [PMA's 1999-2001 contract with St. Paul Re]." (Doc. No. 19 at 4.) In 2008, however, PMA argued that Platinum was not entitled to carry forward any losses from the 1999-2001 contract because Platinum was not a party to that agreement. See Doc. No. 19 Mem., Ex. 5 at 456:25 – 457:5.

The Parties also disputed how to calculate St. Paul Re's ostensible deficit under the 1999-2001 contract. (Doc. No. 21 at 6.) Despite previously reporting to the Pennsylvania Insurance Department that this deficit was slightly more than $6 million, at the time of the arbitration,

> PMA argued that there would be no deficit under the 1999-2001 contract.
> Platinum argued that the deficit was $10.7 million on December 31, 2008.

(Id. at 6-7.)

The 2003 Agreement provides that upon the written request of either Party, any dispute respecting the Agreement's interpretation is to be resolved by a Panel of Arbitrators, "one to be chosen by each party, and the third by the two so chosen." (Doc. No. 19 Mem., Ex. 1 at 01-26.) Pursuant to this provision, on June 2, 2008, Platinum demanded an arbitration, seeking "a

4

declaration that, in the calculation of the balance of the Experience Account under Article 15 of the Agreement, Platinum is entitled to the benefit of the '[d]eficit carry forward from [PMA's 1999-2001 contract with St. Paul Re].'" (Doc. No. 19 Mem., Ex. 2.)

The Arbitrators were selected, and they met in Philadelphia on March 31, April 1, and May 20, 2009, receiving evidence and hearing testimony and legal argument. See Doc. No. 23, Exs. 1-3. On May 22, 2009, the Panel issued its one page award, which, in its entirety, provides that: (1) PMA is to pay Platinum "$6,000,000.00 within 30 days of the date of this award"; (2) upon such payment, "any and all references to a 'deficit carry forward' in the [2003 Agreement will be] removed from the contract"; and (3) "[a]ll other requests for relief by both parties are denied." (Id., Ex. 7.) The Panel offered no reasoning or explanation for its decision.

On June 3, 2009, PMA filed the instant Petition to Vacate, or in the Alternative, to Modify Arbitration Award, arguing that the Panel's decision is impermissibly contrary to both the relief sought by the Parties and the plain language of the 2003 Agreement. (Doc. No. 19 at 7.) PMA asks me to vacate the Panel's award in its entirety or to modify the award and require PMA to pay Platinum $6 million only upon Final Settlement of Ultimate Net Loss or Commutation of the 2003 Agreement. (Id.) On June 17, 2009, Platinum filed a responsive Motion to Confirm Award. (Doc. No. 11.)

## II.     JURISDICTION AND VENUE

Because the Arbitrators adjudicated rights and obligations conferred by a commercial contract between a United States citizen and a foreign citizen, the Award is subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958. See 9 U.S.C. § 202; 9 U.S.C. § 2. Accordingly, this Court has subject matter jurisdiction

pursuant to Section 203 of the Federal Arbitration Act. See 9 U.S.C. § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.").

PMA, which has its principal place of business in this District, consented to this Court's jurisdiction by filing its Petition to Vacate here. See Moore v. Rohm & Haas Co., 446 F.3d 643, 646 (6th Cir. 2006) ("Courts have consistently held that a court always has personal jurisdiction over a named plaintiff because that party, by choosing the forum, has consented to the personal jurisdiction of that court."). Further, the 2003 Agreement provides that Platinum "will submit to the jurisdiction of a court of competent jurisdiction within the United States" to resolve any dispute under the Agreement. (Doc. No. 19 Mem., Ex. 1 at 01-27 – 01-28.) Accordingly, this Court has personal jurisdiction over Platinum. See Jasper v. Bexar County Adult Det. Ctr., 2009 U.S. App. LEXIS 12524, at *3 (3d Cir. June 11, 2009) ("[P]ersonal jurisdiction may be conferred by consent of the parties . . . .") (quoting Zelson v. Thomforde, 412 F.2d 56, 59 (3d Cir. 1969)).

Finally, venue is proper in this District because Section 204 of the FAA provides that a petition to vacate or confirm an arbitration award under the Convention "may be brought . . . in such court for the district and division which embraces the place designated in the agreement as the place of arbitration if such place is within the United States." 9 U.S.C. § 204. Pursuant to the designation in the 2003 Agreement, the Arbitration took place in this District. See Doc. No. 19 Mem., Ex. 1 at 01-27; Doc. No. 23, Ex.7.

### III.  LEGAL STANDARDS

It is "well established that the 'court's function in confirming or vacating a commercial

[arbitration] award is severely limited.'" Mut. Fire, Marine & Inland Ins. Co. v. Norad Rein. Co., 868 F.2d 52, 56 (3d Cir. 1989) (quoting Swift Indus., Inc. v. Botany Indus., Inc., 466 F.2d 1125, 1130 (3d Cir. 1972)). Although my review of the Panel's award must be highly deferential, I am "neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators." Matteson v. Ryder Sys., 99 F.3d 108, 113 (3d Cir. 1996). Indeed, the Federal Arbitration Act expressly allows *vacatur* "[w]here the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). Pursuant to this provision, I may grant PMA's Petition to Vacate only if I find that: (1) the form of the Panel's award cannot "be rationally derived either from the agreement between the parties or from the parties submissions to the arbitrators"; and (2) the terms of the award are "completely irrational." Mut. Fire, 868 F.2d at 56 (citing Swift, 466 F.2d at 1131).

## IV.  DISCUSSION

Once again, the Arbitrators ordered: (1) that PMA pay Platinum "$6,000,000.00 within 30 days of the date of this award"; and (2) upon such payment, "any and all references to a 'deficit carry forward' in the [2003 Agreement will be] removed from the contract." (Doc. No. 23, Ex. 7.) This relief was not sought by either Party, contravenes the contract the Panel was charged with interpreting, and writes out of existence a key provision of that contract. The Panel offered no explanation for its decision. Moreover, although Platinum argues (unpersuasively) that the $6 million award was rational, it does not address the Panel's elimination of the Deficit Carry Forward Provision. In these circumstances, I am compelled to grant PMA's Petition to Vacate.

### A.  The Award Cannot Be Rationally Derived from the 2003 Agreement

The Arbitrators evidently found the Deficit Carry Forward Provision to be more trouble

than it was worth and simply eliminated it from the 2003 Agreement. This "reading" of the Agreement was to Platinum's detriment: the Provision allows the reinsurer to spread its deficits in the hope of recouping them. In an apparent effort to "compensate" Platinum for this loss, the Arbitrators also allowed Platinum to "carry forward" one last deficit: they ordered PMA to pay Platinum $6 million – the amount PMA had earlier indicated was the deficit in the 1999-2001 Experience Account – even though the preconditions for that payment had not been met: (1) Platinum had not paid out its policy limits under the 2003 Agreement; and (2) the Parties had not agreed to Commutation. Although Platinum apparently concedes that these preconditions were not met, it believes that the Award was consistent with Article 25 of the 2003 Agreement, which directs the arbitrators to

> interpret this Agreement as an honorable engagement and not merely as a legal obligation. They are relieved of all judicial formalities and may abstain from following the strict rules of law. They will make their award with a view to effecting the general purpose of the Agreement in a reasonable manner rather than in accordance with the literal interpretation of the language.

(Doc. No. 19 Mem., Ex. 1 at 01-26.) Platinum argues that this Honorable Engagement Clause "conferred on the arbitrators broad powers to order remedies they deem appropriate. . . . Having agreed to confer those broad powers on the arbitrators, PMA cannot now argue persuasively that the arbitrators exceeded them." (Doc. No. 21 at 1-2.) I do not agree.

Platinum correctly observes that "[c]ourts have read [honorable engagement] clauses generously, consistently finding that arbitrators have wide discretion to order remedies they deem appropriate." Banco de Seguros del Estado v. Mut. Marine Office, Inc., 344 F.3d 255, 261 (2d Cir. 2003). See also Pac. Reins. Mgmt. Corp. v. Ohio Reins. Corp., 935 F.2d 1019, 1025 (9th Cir. 1991) (where a contract expressly "relieve[s arbitrators] of all judicial formalities" and

8

allows them to "abstain from following the strict rules of law," the arbitrators have broad authority, including the power to award pre-hearing security); St. Paul Fire & Marine Ins. Co. v. Eliahu Ins. Co. Ltd., 1997 U.S. Dist. LEXIS 8916, at *25 (S.D.N.Y. June 26, 1997) (under an arbitration clause similar to Article 25, arbitrators are "free to disregard New York substantive law.").

Even broad discretion has limits, however. The Honorary Engagement Clause allowed the Arbitrators to stray from "judicial formalities" and the 2003 Contract's "literal language" to effectuate in a "reasonable manner" the Contract's "general purposes." No court has held that such a clause gives arbitrators authority to re-write the contract they are charged with interpreting. Rather, courts have held just the opposite. In Banco, for instance, the Second Circuit noted that "[w]here an arbitration clause is broad, as here, arbitrators have the discretion to order remedies they determine appropriate, [but only] *so long as they do not exceed the power granted to them by the contract itself.*" Banco, 344 F.3d at 261 (emphasis added). See Saint Mary Home, Inc. v. Serv. Employees Int'l Union, Dist. 1199, 116 F.3d 41, 44 (2d Cir. 1997) ("The principal question for the reviewing court is whether the arbitrator's award draws its essence from the [parties'] agreement, since the arbitrator is not free merely to dispense his own brand of [] justice."); Osceola County Rural Water Sys., Inc. v. Subsurfco, Inc., 914 F.2d 1072, 1075 (8th Cir. 1990) ("[Even where] the arbitrator's authority is broad, it is not unlimited."). See also Inter-City Gas Corp. v. Boise Cascade Corp., 845 F.2d 184, 187 (8th Cir. 1988).

The 2003 "contract itself" requires the enforcement of the Deficit Carry Forward Provision, not its elimination. I believe that Platinum has not addressed this part of the Panel's decision because it is obvious that the Arbitrators exceeded their authority under the Honorable

9

Engagement Clause. Moreover, as the Parties concede, the "contract itself" also imposes conditions – neither of which has been met – before Platinum may recover any of its deficit from PMA.

In these circumstances, the Panel's award cannot be rationally derived from the 2003 Agreement. See Kaplan v. First Options, 19 F.3d 1503, 1512 (3d Cir. 1994) (the court may vacate an arbitrator's award that does not "draw its essence" from the contract); Meadows Indem. Co. v. Arkwright Mut. Ins. Co., 1996 U.S. Dist. LEXIS 14318, at *10 (E.D. Pa. Sept. 30, 1996) ("The court may [] vacate the award if it finds that the arbitrators' decision was in manifest disregard of the [contract].") (citing Swift, 466 F.2d at 1125); Recyclers Ins. Group, Ltd. v. Ins. Co. of North America, 1992 U.S. Dist. LEXIS 8731 (E.D. Pa. June 15, 1992) (vacating award because it was not rationally derived from the terms of the parties' underlying agreement).

**B.     The Award Cannot Be Rationally Derived from the Parties' Submissions**

The Parties' never asked the Panel to eliminate the Deficit Carry Forward Provision. Rather, they disputed the size of the 1999-2001 deficit, how it should be calculated, and whether Platinum was entitled to carry forward the deficit St. Paul Re had incurred. See Doc. No. 19 Mem., Ex. 5 at 431:23 – 432:3 (closing argument of Platinum's counsel, "asking the panel to make a declaration about the correct principles for computing the deficit to be carried forward into the 2003 agreement."); Id. at 492:25 – 493:5 (closing argument of PMA's counsel, asserting that "[i]n contrast to Platinum's approach, PMA's method of calculating and reporting the balance of the [1999-2001 deficit] follows the terms of the [ 2003 Agreement]."); Id. at 456:25 – 457: 5 (closing argument of PMA's counsel, asserting that because Platinum was not a party to the 1999-2001 agreement, "there's no hole to climb out of, or any losses to pay back, [such that]

10

the deficit carryforward simply, by definition, doesn't come into play."); Id. at 525 lns. 5-9 (closing argument of Platinum's counsel, asserting that PMA's argument "rests on a false assumption that a deficit under a prior agreement has to be a deficit suffered by the reinsurer who's benefitting from the carryforward.").

Moreover, the Parties did not ask the Panel to order PMA immediately to pay any such deficit (whether $6 million or some other amount) to Platinum. PMA argued, *inter alia*, that even if Platinum could "carry forward" St. Paul's 1999-2001 losses, Platinum was not entitled to any offset because contractual preconditions had not been met. See id. at 499 lns. 8-18 (closing argument of PMA's counsel that "the purpose of the deficit carryforward in the 2003 agreement is to give reinsurers with a paid loss deficit from '99-'01 a second opportunity to trade out of that deficit. *A[t] commutation or final settlement*, a resinurer gets the benefit of the deficit carryforward by setting off any unfunded losses from '99-'01 against the 2003 experience account balance.") (emphasis added). Similarly, Platinum never asked the Panel to order any immediate payment. Rather, Platinum sought only "a *declaration* that, in the *calculation* of the balance of the Experience Account under Article 15 of the Agreement, Platinum is entitled to the benefit of the '[d]eficit carry forward from [PMA's 1999-2001 contract with St. Paul Re].'" (Doc. No. 19 Mem., Ex. 2) (emphasis added). Platinum subsequently reiterated that it asked the Panel only for

> a *declaration* that the 2003 contract does provide for Platinum to retain the amount of any deficit carryforward. We'll ask the panel for [a] *declaration* about how that deficit carry forward is to be calculated, and we'll ask the panel for an order that *at the time the deficit carryforward is made concrete by the future payment of losses*, that PMA is required to disburse those funds to Platinum from the funds withheld account, and we'll ask the panel to retain jurisdiction to supervise this ongoing relationship.

11

(Doc. No. 19 Mem., Ex. 3 at 15:25 – 16:14) (emphasis added).

Significantly, Platinum does not dispute PMA's contention that the Panel's decision was at odds with the Parties' submissions. See Doc. No. 9; Doc. No. 11; Doc. No. 21; Doc. No. 28. In these circumstances, I must conclude that the award was not rationally derived from the Parties' submissions. See Metromedia Energy, Inc. v. Enserch Energy Servs., 409 F.3d 574, 578 (3d Cir. 2005) ("[A]rbitration is a creature of contract, and an arbitration panel has the authority to decide only the issues that have been submitted for arbitration by the parties.") (citing Matteson., 99 F.3d at 114); Fahnestock & Co., Inc. v. Waltman, 935 F.2d 512, 514 (2d Cir. 1991) ("[I]f arbitrators rule on issues not presented to them by the parties, they have exceeded their authority and the award must be vacated.") (internal citations and quotation marks omitted); Courier-Citizen Co. v. Boston Electrotypers Union No. 11, 702 F.2d 273, 281 (1st Cir. 1983) ("While an arbitrator has broad power to fashion remedies on issues the parties have empowered him to resolve, he lacks authority to decide questions the parties have not agreed to submit to him.") (internal citations omitted).

### C.   The Panel's Award Is Completely Irrational

Even when an arbitration award cannot be rationally derived from the underlying agreement or from the parties' submissions, that award is not subject to judicial revision unless it is "completely irrational." Swift, 466 F.2d at 1131. An arbitration award based on the interpretation of a contract is irrational if the award "does not draw its essence therefrom and . . . is in manifest disregard thereof." Id. at1134. See also Kyocera Corp. v. Prudential-Bache T Servs., 341 F.3d 987, 997 (9th Cir. 2003) (en banc) ("[A]rbitrators 'exceed their powers' . . . when the award is 'completely irrational,' or exhibits a 'manifest disregard of law.'") (citations

12

omitted); Shabazz-Allah v. Local 32B-32 J.S.E.I.U., 2000 U.S. App. LEXIS 814, at *3 (2d Cir. Jan. 21, 2000) (a court may vacate an arbitration award where it "concludes that the award was completely irrational or violative of a strong public policy."); Lee v. Chica, 983 F.2d 883, 885 (8th Cir. 1993) ("[A]n arbitration award will not be set aside unless it is completely irrational or evidences a 'manifest disregard for law.'") (citations omitted).

As I have discussed, the Parties' obligations in connection with the Deficit Carry Forward Provision are essential parts of the 2003 Reinsurance Agreement. The Panel's decision to obligate PMA to pay $6 million to Platinum – thus re-writing Article 19 – and eliminate the Deficit Carry Forward Provision altogether obviously "does not draw its essence" from the Agreement, but rather "is in manifest disregard thereof." Swift, 466 F.2d at 1134.

Any evaluation of the Arbitrators' decision is made more difficult by their failure to offer any supporting explanation or reasoning. The arbitration record shows that the gravamen of the Parties' dispute was the Deficit Carry Forward Provision. Once again, PMA contested both the applicability of St. Paul's deficit to Platinum and Platinum's method of calculating that deficit. See Doc. No. 19 Mem., Ex. 5 at 456:25 – 457: 5; Id. at 485-499. Platinum argued that it was entitled to carry forward $10.7 million in losses, and asked the Panel to "retain jurisdiction" over the dispute to ensure PMA's compliance with the Deficit Carry Forward Provision. See Doc. No. 21 at 6-7; Doc. No. 19 Mem., Ex. 4. The Panel apparently believed it could "reasonably" resolve these disagreements by eliminating the Provision itself. Accordingly, acting on Article 25's "rough justice" imperative, the Arbitrators simply took the Provision out of the contract. This, in my view, is "completely irrational," the Panel's broad discretion notwithstanding. See Saint Mary Home, 116 F.3d at 44 ("[T]he arbitrator is not free merely to dispense his own brand

13

of [] justice."); Subsurfco, 914 F.2d at 1075 ("[Even where] the arbitrator's authority is broad, it is not unlimited. The arbitrator . . . [may not] disregard or modify unambiguous contract provisions.") (internal citations and quotation marks omitted); Inter-City Gas, 845 F.2d at 187 ("[I]f the arbitrator interprets unambiguous language in any way different from its plain meaning, [the arbitrator] amends or alters the agreement and acts without authority.") (internal citations and quotation marks omitted).

I have found no decision – and Platinum has offered none – that an Honorable Engagement Clause authorizes arbitrators, acting *sua sponte*, to eliminate material provisions of the contract they are charged with interpreting. Once again, Platinum does not even address this aspect of the Panel's decision.

To "compensate" Platinum for its loss of the Deficit Carry Forward Provision, the Panel ordered PMA to pay Platinum $6 million even though it was not contractually entitled to this payment. The Panel thus sought to "balance" one irrational decision (the Deficit Carry Forward Provision's elimination) with another (the award to Platinum of a large amount of money to which it was not contractually entitled). I find this "completely irrational" as well. Cf. Mo. River Servs. v. Omaha Tribe, 267 F.3d 848, 855 (8th Cir. 2001) (order that arbitrators' award be paid from profits of Indian tribe's Iowa casino was irrational and "failed to draw its essence from the [parties' a]greement" because that agreement explicitly provided that any award would be paid from profits of the tribe's Nebraska casino); Swift, 466 F.2d at 1132, 1135 (where underlying contract allows cash remedies only for tax liabilities already "incurred or suffered," the arbitrator's award of substantial cash bond to protect party from possible tax liability is vacated because of its "complete lack of rationality.").

## V. CONCLUSION

I well understand that my review of the Panel's Award is "severely limited." Mut. Fire, 868 F.2d at 56 (quoting Swift, 466 F.2d at 1130). In the circumstances presented, however, I am compelled to grant PMA's Petition to Vacate Arbitration Award and deny Platinum's Motion to Confirm Award. In light of my decision, I need not address PMA's alternate request for modification.

An appropriate Order follows.

BY THE COURT.

_____
**Paul S. Diamond, J.**